**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 11-4371

PRENTISS WATSON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Richard D. Bennett, District Judge.
(1:10-cr-00483-RDB-1)

Argued: September 20, 2012

Decided: January 2, 2013

Before NIEMEYER and KEENAN, Circuit Judges, and
Michael F. URBANSKI, United States District Judge for
the Western District of Virginia, sitting by designation.

Vacated and remanded by published opinion. Judge Keenan
wrote the majority opinion, in which Judge Urbanski joined.
Judge Niemeyer wrote a dissenting opinion.

**COUNSEL**

**ARGUED:** Susan Amelia Hensler, OFFICE OF THE FED-ERAL PUBLIC DEFENDER, Baltimore, Maryland, for Appellant. Christopher M. Mason, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, Baltimore, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

---

**OPINION**

BARBARA MILANO KEENAN, Circuit Judge:

Prentiss Watson was convicted by a jury of possession of a firearm by a felon, and of possession of ammunition by a felon, each in violation of 18 U.S.C. § 922(g). On appeal, he challenges the district court's denial of his motion to suppress an incriminating statement he made after being detained by police for three hours without probable cause. The detention occurred inside a convenience store where Watson was working, while the police awaited authorization for a search warrant involving drug-related activities of other persons.

After the district court denied Watson's motion to suppress, Watson was convicted of both offenses following a four-day jury trial. He argues that the district court erred in denying his motion to suppress because his incriminating statement was the product of an illegal detention. Upon our review, we hold that: (1) Watson's three-hour detention constituted an unlawful custodial arrest in violation of his Fourth Amendment rights; (2) the taint of the unlawful custodial arrest was not purged by the two *Miranda* warnings provided during his detention or by any intervening circumstance; and (3) the erroneous admission of Watson's statement was not harmless

error. Accordingly, we vacate Watson's convictions, and remand the case to the district court.

## I.

Watson worked at a convenience store, which was located at 2700 Tivoly Avenue (the building) in Baltimore, Maryland. He also lived in the building, in a room located on the second floor. There were two other rooms located on that floor.

On February 23, 2010, detectives employed by the Baltimore City Police Department (the officers) were conducting surveillance of the block on which the building is located. After the officers observed some individuals engaging in suspected drug transactions near the building, the officers made several arrests. Anthony Jackson, who lived in a second-floor room in the building and was one of the individuals arrested, had been observed entering and leaving the building during the course of a suspected drug transaction. The officers thought that Jackson was carrying a weapon at the time of the suspected drug transaction[1] but, when Jackson was arrested after leaving the building, the officers did not find a weapon on his person.

After arresting Jackson, the officers decided to obtain a search warrant for the building. At that point, one of the officers, Detective Richard Jamison, began preparing the search warrant application, while several other officers entered the building to secure it and to prevent the destruction of evidence. As described by Detective Jamison, law enforcement officers in Baltimore City generally secure a building as follows:

> [W]e make entry, in general, and always, we check every location a human being could be to make sure

---

[1]According to one of the officers, Jackson "exhibited characteristics of an armed person."

that we're all safe, and we don't have armed suspects in the [building]. We take those individuals. We secure them in a central location where they could be watched for everyone's safety. And then we get the warrant, assuming we don't already have a warrant.

The officers' efforts to secure the building were in conformance with these procedures. Upon entering the building, the officers encountered two individuals in the convenience store section of the building, Keta Steele, the owner of the store, and Watson. The officers immediately instructed Watson and Steele to "sit down," and advised them of their rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Neither Watson nor Steele was among the individuals the officers observed engaging in the suspected drug transactions near the building, and the officers did not have information linking Watson or Steele to criminal activity of any kind.

The officers kept Watson and Steele in the back area of the store for about three hours while waiting for Detective Jamison to return with a search warrant.[2] During this time, the officers did not inform Watson or Steele that they were free to leave, nor did the officers ask Watson or Steele any questions about the criminal activity observed near the building.

When Detective Jamison returned to the building with the search warrant, the officer who had restrained Watson again advised him of his *Miranda* rights while Detective Jamison began a search of the second-floor rooms. During his search of the second floor, Detective Jamison observed a shotgun in the "back room," and returned to the first floor to ask Watson about the shotgun. Watson replied that he knew nothing about

---

[2]After hearing conflicting testimony regarding the length of Watson's detention, the district court determined that Watson was detained by the officers for three hours. Watson does not argue that the district court clearly erred in making this factual finding.

a shotgun, and stated that he lived in the "front room" on the second floor.[3]

Detective Jamison returned to the second floor to search the front room, where he observed a zipped toiletry bag lying near Watson's closet.[4] When Detective Jamison opened the bag, he found a revolver and ammunition of various types. After recovering these items, Detective Jamison asked Watson about them. At that time, Watson replied, referring to the revolver: "[T]hat old thing, it doesn't even work."

Before trial, Watson filed a motion to suppress his statement on Fourth Amendment grounds, seeking to exclude from evidence the response he made to Detective Jamison about the revolver. Watson argued that he was subjected to an unlawful detention without probable cause, and that his statement should be suppressed as the product of an illegal arrest. The district court denied Watson's motion.

The case proceeded to trial, after which the jury found Watson guilty of both counts of violating 18 U.S.C. § 922(g).[5] The jury's deliberations lasted for a period of more than nine hours, during which the jury twice asked the court to read portions of Detective Jamison's testimony concerning Watson's statement about the revolver.

The district court sentenced Watson to two concurrent terms of imprisonment of 31 months. Watson filed a timely notice of appeal.

---

[3]Anthony Jackson lived in the "middle room" on the second floor.

[4]Detective Jamison also located items of paperwork in this room that bore Watson's name.

[5]Watson's firearm conviction was based solely on his possession of the revolver.

## II.

On appeal, Watson challenges only the district court's denial of his motion to suppress. We review the district court's factual findings regarding the motion to suppress for clear error, and the court's legal conclusions de novo. *United States v. Burgess*, 684 F.3d 445, 452 (4th Cir. 2012); *United States v. Edwards*, 666 F.3d 877, 882 (4th Cir. 2011). When, as here, a motion to suppress has been denied, we view the evidence presented in the light most favorable to the government. *United States v. McBride*, 676 F.3d 385, 391 (4th Cir. 2012).

## A.

We first address the question whether Watson was "seized" within the meaning of the Fourth Amendment. A seizure warranting Fourth Amendment protection occurs when in view of the totality of the circumstances, a reasonable person would not feel free to leave or otherwise to terminate an encounter with police. *United States v. Lattimore*, 87 F.3d 647, 653 (4th Cir. 1996) (citing *Florida v. Bostick*, 501 U.S. 429, 438 (1991)). As a general rule, a seizure requires either the use of physical force or, absent the use of such force, a submission to an officer's assertion of authority. *California v. Hodari D.*, 499 U.S. 621, 626 (1991).

The government concedes that Watson was "seized" at the time of his initial detention. We agree that a seizure occurred here, because a reasonable person in Watson's position would not have felt "free to leave" the area of the building in which he was held, or otherwise to terminate the encounter with the officers. When the officers entered the building, they instructed Watson to "sit down," informed him of his *Miranda* rights, and kept him confined to a limited area during the entire three-hour detention. Accordingly, the officers' actions effected a seizure of Watson, within the meaning of the Fourth Amendment.

### B.

We turn to consider the issue whether Watson's seizure and detention violated his rights under the Fourth Amendment, which protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. In cases involving a seizure, the standard of "reasonableness" typically is satisfied by a showing that the police had probable cause to conclude that the individual seized was involved in criminal activity. *Dunaway v. New York*, 442 U.S. 200, 213-14 (1979). This standard of probable cause constitutes "the minimum justification necessary to make the kind of intrusion involved in an arrest 'reasonable' under the Fourth Amendment." *Id.* at 208. As a general rule, "an official seizure of the person must be supported by probable cause, even if no formal arrest is made." *Michigan v. Summers*, 452 U.S. 692, 696 (1981) (citing *Dunaway*, 442 U.S. at 212-13). The government bears the burden of demonstrating that a warrantless seizure is reasonable. *See Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984); *Vale v. Louisiana*, 399 U.S. 30, 35 (1970); *United States v. Jeffers*, 342 U.S. 48, 51 (1951).

### i.

In analyzing the reasonableness of a seizure that is not supported by probable cause,[6] courts are required to evaluate "the law enforcement interest and the nature of the 'articulable facts' supporting the detention." *See Summers*, 452 U.S. at 702. This analysis entails a balancing test because, under the Fourth Amendment, "reasonableness 'depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" *United States v. Stanfield*, 109 F.3d 976, 979 (4th Cir. 1997) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)) (other citations omitted). Thus, to determine whether

---

[6]The government concedes, and we agree, that the officers did not have probable cause to detain Watson.

Watson's seizure and continued detention were reasonable, "we [must] balance[ ] the intrusion on [Watson's] Fourth Amendment interests against [the] promotion of legitimate governmental interests." *Maryland v. Buie*, 494 U.S. 325, 331 (1990) (citations omitted); *see also United States v. Legg*, 18 F.3d 240, 245 (4th Cir. 1994) (citing *Buie*).

In the present case, the government relies on *Illinois v. McArthur*, 531 U.S. 326 (2001), advancing two reasons to justify the intrusion on Watson's privacy and liberty: (1) preventing the destruction of evidence; and (2) ensuring the safety of the police officers present in the building. In conducting the balancing test required by *Buie*, we conclude that the cited governmental objectives, although very important as a general matter, were not implicated sufficiently in the present case to justify the significant intrusion on Watson's Fourth Amendment rights.

We observe that the facts of this case are highly unusual, if not unique. The facts framing our analysis include the three-hour detention of an individual, whom the police encountered in a building open to the public, at a time when a search warrant had not been authorized. During the entire course of that three-hour detention, the police had no reason to believe that the detained individual was linked to any criminal activity, including the evidence sought in the search warrant application.

Our "reasonableness" inquiry is guided by principles applied in several cases, including the Supreme Court's decisions in *Summers* and *McArthur*. We first consider the Supreme Court's decision in *Summers*, which addressed the constitutionality of a seizure and detention incident to the execution of a search warrant. There, the police had obtained a search warrant for a residence before detaining for the duration of the search an occupant of the premises seen leaving the house.[7] *Id.* at 693. The Court assumed that the detention

---

[7]The police quickly learned that this individual was the owner of the house to be searched.

was not supported by probable cause, but held that the seizure nevertheless was reasonable because the police had obtained the search warrant before the seizure occurred. *Id.* at 701-05.

In its analysis, the Court stated that it was "[o]f prime importance" in assessing the legality of the defendant's detention that "the police had obtained a warrant to search [his] house for contraband." *Id.* at 701. The Court observed that before the defendant was seized, a neutral and detached magistrate already had "authorized a substantial invasion of the privacy of the persons who resided there," *id.*, and, therefore, the search warrant "provide[d] an objective justification for the detention." *Id.* at 703. Thus, the prior authorization of the search warrant at the time the defendant was detained was the foundation of the *Summers* holding.

Based on these considerations, the Court held that for purposes of the Fourth Amendment, a search warrant authorized upon a finding of probable cause "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."[8] *Id.* at 705. The Court also left open the possibility that the seizure of a person could be lawful in the absence of a search warrant, if justified by exigent circumstances. *Id.* at 702 n.17.

The Supreme Court later confronted such a situation in *McArthur*. There, the Court held that police officers did not violate the Fourth Amendment when they prevented a defendant from entering his home for about two hours while the officers obtained a search warrant for the premises. 531 U.S. at 328. The officers took this action after learning from the defendant's wife that the defendant "had dope in there," and that she had seen him "slid[e] some dope underneath the couch." *Id.* at 329.

---

[8]The Court nevertheless cautioned that its holding may not be applicable in cases involving a "prolonged detention." *Id.* at 705 n.21.

The Supreme Court characterized the officers' actions as a "temporary seizure."**⁹** *Id.* at 330. The Court held that the officers' conduct was reasonable on several grounds, including that the officers had probable cause to believe the defendant was harboring illegal narcotics in his residence, and that the officers reasonably feared the defendant would destroy the drugs unless he was restrained until after the search was completed. *Id.* at 332. The Court further observed, with approval, that the defendant was restrained in a significantly less restrictive manner than would have occurred in the case of an arrest, because he was prevented only from entering his residence unaccompanied. *Id.* at 332. Thus, the Court concluded that the officers made reasonable efforts to reconcile their law enforcement objectives with the defendant's right to personal privacy. *Id.*

In our view, the holding in *McArthur* is inapposite to the present case for several reasons: (1) the officers did not suspect Watson of engaging in any criminal activity at the time of his detention; (2) the officers did not have any reason to believe that Watson would destroy any contraband in the building; (3) the restraint imposed on Watson was more severe, both in character and in duration, than the restraint imposed on the defendant in *McArthur*; and (4) the present record lacks any justification for the length of the detention that occurred in this case. We discuss these distinctions below.

Most significantly, we distinguish *McArthur* on the basis that the police there had direct evidence that drugs belonging to the defendant would be found inside his home. *See id.* at

---

**⁹**It is unclear from the Court's opinion whether the Court used the term "seizure" with reference to the defendant's residence, to the defendant himself, or to both the residence and the defendant. However, this use of the term "seizure" does not need to be clarified for purposes of the present case, because the holding in *McArthur* is distinguishable irrespective of the focus of the Court's reference.

329. Here, however, it is uncontested that the police did not suspect Watson of any criminal activity, and lacked any basis for connecting Watson to the contraband sought in the search warrant application. Thus, although the seizure of the building may have been supported by probable cause, the seizure of Watson himself was not so supported, in contrast to the seizure that occurred in *McArthur*. *Cf. id.* at 334. Likewise, the police had no basis to conclude that Watson might attempt to destroy or hide the evidence sought in the search warrant application.[10]

Although the Supreme Court could have done so in *McArthur*, the Court did not announce a bright-line rule permitting police to detain any person found on property while the officers are awaiting authorization of a search warrant for that property. Rather, the Court focused on the existence of a connection between the defendant and the contraband that was the subject of the search warrant application. *See id.* at 332.

We also observe that *McArthur* involved a restraint that was different in both character and duration from the restraint imposed on Watson. In *McArthur*, the defendant merely was prevented from entering his residence unaccompanied, because the police reasonably feared that he would destroy the drugs identified by his wife. The restraint imposed on Watson, however, was not so limited or tailored. Rather than removing Watson from the building and prohibiting his reentry, the police kept Watson confined inside the building the entire time that they were preparing and awaiting authorization of the search warrant.

We further note that, in considering the length of the defendant's detention in *McArthur*, the Supreme Court observed

---

[10]We observe that the record does not show that the police even were aware that Watson lived in the building until after Detective Jamison returned with the signed warrant.

that "as far as the record reveals," the defendant's two-hour restraint "was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant." *Id.* at 332-33. In contrast, the record before us lacks any evidence explaining the reason why it took the officers three hours to obtain the search warrant and return to the building.[11] Although the district court stated that "[t]he warrant was approved as quickly as possible in light of the caseload that the state judges in Baltimore need to deal with," there is no evidence supporting this conclusion.

In sum, each of the reasons justifying the police conduct in *McArthur* is either absent here or weighs against a conclusion that the officers reasonably seized and detained Watson. Accordingly, the holding in *McArthur* fails to support the district court's denial of Watson's motion to suppress.

ii.

Because the holdings in *Summers* and *McArthur* do not provide support for Watson's prolonged detention, and in the absence of any precedential cases supporting the government's argument, we return to the "ultimate standard" embodied in the Fourth Amendment, the standard of reasonableness. *See Summers*, 452 U.S. at 699-700. As we noted above, "in determining reasonableness, we [must] balance[ ] the intrusion on the individual's Fourth Amendment interests against [the] promotion of legitimate governmental objectives." *Buie*, 494 U.S. at 331.

We need not belabor the point that Watson's three-hour detention in a confined space and under constant police surveillance was a substantial intrusion on his Fourth Amend-

---

[11]The only evidence in the record concerning the amount of time involved in Detective Jamison's efforts to obtain the search warrant are his notes reflecting that the warrant was signed at 3:34 p.m., and that he delivered the signed warrant to the officers present in the building at 3:45 p.m.

ment rights. Against this substantial intrusion, we consider the law enforcement objectives underlying the officers' decision to detain Watson while the search warrant was obtained, namely, the need to preserve evidence and the concern for officer safety.

We do not question the proposition that these two objectives are important law enforcement goals. They are. With respect to officer safety, we observe that the protection of police officers is of particular concern in cases in which both drugs and firearms are the subject of a pending search warrant. As the Supreme Court explained in *Buie*, police officers need to be assured that the persons with whom they are dealing are not "armed with, or able to gain immediate control of, a weapon that could unexpectedly and fatally be used against [the officers]." 494 U.S. at 333 (holding that police did not need "probable cause" to conduct a "protective sweep" of a residence when executing an arrest warrant); *see also United States v. Laudermilt*, 677 F.3d 605, 610 (4th Cir. 2012) (discussing *Buie*). Thus, in securing the building, it was reasonable for the officers here to locate the individuals present in the building and to bring them to a central location.

In the absence of probable cause, however, an intrusion on an individual's Fourth Amendment rights must be "strictly circumscribed by the exigencies which justify its initiation." *Terry v. Ohio*, 392 U.S. 1, 26 (1968). For instance, as discussed in *Buie*, police officers may conduct a "protective sweep" of a residence without probable cause, so long as the search "extend[s] only to a cursory inspection of those spaces where a person may be found," and "*lasts no longer than is necessary* to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." 494 U.S. at 335-36 (emphasis added). Thus, the extent of any Fourth Amendment intrusion undertaken for purposes of officer safety must be "*no more than necessary* to protect the officer from harm." *Buie*, 494 U.S. at 333 (discussing *Terry*) (emphasis added).

We are not aware of any Supreme Court case or federal appellate decision permitting a three-hour detention of an occupant of a building who lacks any specific connection to suspected criminal activity, while police obtain a warrant to search that building.[12] Moreover, the detention that occurred in the present case lasted significantly longer than any reasonable period the officers needed to alleviate potential threats to their safety. At some point during Watson's detention, likely close to its inception, any potential threat that Watson posed to the officers' safety had dissipated. Thus, at that point, any reasonable justification for continuing to detain Watson dissipated as well.

This is not a case in which there was any evidence presented to the district court suggesting that the police were reasonably concerned that the release of Watson, and the owner of the store, Steele, could endanger the officers who were awaiting the issuance of the search warrant. There is no evidence in the record that Watson posed any risk to officer safety, and that his continued seizure was necessary for that reason. Further, the mere supposition that Watson, if he had been removed from the building, could have alerted others concerning the police activity in the building did not provide such a justification to detain Watson. The present record lacks any evidence that Watson knew individuals who had not been detained, but were connected to the suspected criminal activity, and who could have posed a threat to the officers' safety. Therefore, the record fails to support the need for even a brief extension of Watson's initial detention until additional officers could be brought to the area to monitor the situation.

Accordingly, in "balanc[ing] the intrusion on [Watson's] Fourth Amendment interests against [the] promotion of legitimate governmental interests," *Buie*, 494 U.S. at 331, we hold that the evidence in this case weighs decisively in Watson's

---

[12]As explained later in this opinion, the four cases cited by our colleague in dissent are inapposite.

favor. There simply is nothing in the record in this case suggesting that the government has met its burden of demonstrating a legitimate public interest in detaining Watson for three hours. Thus, we conclude that Watson's three-hour detention was unreasonable and constituted an unlawful custodial arrest in violation of his Fourth Amendment rights.

### iii.

We observe that our dissenting colleague would create a new rule of constitutional law allowing the police to detain citizens for a substantial amount of time, despite the absence of a search warrant or the absence of any information connecting those citizens to participation in criminal activity. In reaching this conclusion, the dissent misconstrues our holding and broadens, without foundation, the holdings of cases the dissent cites to support its view.

### a.

Contrary to the dissent's contention, our holding does not impose a requirement that after completing a *Buie* protective sweep, the police must have probable cause to support the continued detention of an occupant of a building while a search warrant is being obtained. Because our holding is based on the officers' admission that the police had *no* information linking Watson to criminal activity in the building, we need not reach, and do not consider, the level of suspicion required to detain an individual in these circumstances.

We further observe that the Supreme Court has never accepted the view advanced by the dissent that a person's mere proximity to a location of suspected criminal activity allows police to subject that individual to a prolonged detention in the absence of a search warrant. Contrary to the dissent's view, a building and a person present in that building are not treated the same when conducting a Fourth Amendment analysis.

b.

The dissent's reliance on certain cases to support its view,
particularly its discussion of *Summers*, reflects a misreading
of the holdings in those cases. The dissent discusses *Summers*
as if the presence of a search warrant at the time of the deten-
tion was a mere afterthought in the Court's analysis. How-
ever, as we already have stated, the presence of a search
warrant was central to the Court's decision. The Court began
its analysis in *Summers* by stating that "*[o]f prime importance*
in assessing the intrusion [on the defendant's privacy and lib-
erty] is the fact that the police *had obtained* a warrant to
search [defendant's] house for contraband." 452 U.S. at 701
(emphasis added). And, as noted above, the Court emphasized
that, at the time of the detention, a magistrate judge had
already "authorized a substantial invasion of the privacy" of
the persons residing in the place to be searched. *Id.*

Later in the *Summers* opinion, the Court reiterated the
importance of the fact that the police already had obtained a
search warrant at the time the resident was detained. The
Court stated that "the detention represents only an incremental
intrusion on personal liberty *when the search of a home has
been authorized by a valid warrant.*"[13] *Id.* at 703 (emphasis
added).

---

[13]In a footnote, the Court expanded on the importance of a magistrate,
rather than an officer on the scene, making decisions that would otherwise
infringe on a citizen's Fourth Amendment rights. Quoting from the
Court's opinion in *Johnson v. United States*, 333 U.S. 10 (1948), the Court
in *Summers* observed that

> [t]he point of the Fourth Amendment, which often is not grasped
> by zealous officers, is not that it denies law enforcement the sup-
> port of the usual inferences which reasonable men draw from evi-
> dence. Its protection consists in requiring that those inferences be
> drawn by a neutral and detached magistrate instead of being
> judged by the officer engaged in the often competitive enterprise
> of ferreting out crime. Any assumption that evidence sufficient to
> support a magistrate's disinterested determination to issue a

Despite this unequivocal language, the dissent maintains that the holding in *Summers* supports a detention in the absence of a warrant. Such a conclusion, however, would render superfluous the Court's explicit and extensive discussion of the importance of the existing search warrant in its analysis.[14]

The dissent also quotes out of context a footnote in *Summers*, which states that "[t]he fact that our holding today deals with a case in which the police had a warrant does not, of course, preclude the possibility that comparable police conduct may be justified by exigent circumstances in the absence of a warrant." 452 U.S. at 702 n.17. In that footnote, the Court did not imply that such a detention would be permissible, but merely reserved that issue for future determination. Thus, the dissent's reliance on this language of "possibility" as the centerpiece of its analysis is fundamentally misplaced.[15]

---

search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. . . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent.

*Summers*, 452 U.S. at 703 n.18 (quoting *Johnson*, 333 U.S. at 13-14).

[14]For these reasons, the dissent's reliance on *Muehler v. Mena*, 544 U.S. 93 (2005), also is not persuasive. The Court's opinion in *Muehler*, relying exclusively on *Summers*, recites the unremarkable proposition that "officers executing a search warrant for contraband have the authority 'to detain the occupants of the premises while a proper search is conducted.'" *Muehler*, 544 U.S. at 98 (quoting *Summers*, 452 U.S. at 705). Applying this well-settled principle, the Court held that "Mena's detention for the duration of the search was reasonable under Summers *because a warrant existed* to search 1363 Patricia Avenue and she was an occupant of that address at the time of the search." *Id.* (emphasis added). Similarly, as the dissent itself observes, the search and detention at issue in *United States v. Photogrammetric Data Servs.*, 259 F.3d 229, 239 (4th Cir. 2001), occurred after the police had obtained a warrant.

[15]We further observe that even if the holding in *Summers* is extended at a future date such that exigent circumstances, as a general matter, could

Moreover, if the dissent's reading of that footnote were an accurate portrayal of the law, the Supreme Court simply would have resolved the legality of the seizure at issue in *McArthur* on the basis that the police had probable cause to search the defendant's mobile home. That fact, however, was but one of several reasons that the Court employed to uphold the seizure in that case. Most importantly, independent of the probable cause determination, the Supreme Court analyzed the specific facts of the case and determined that the police reasonably concluded that the defendant, who had been identified as the owner of illegal drugs stored in his home, would destroy the drugs before the officers could return with a warrant. *See* 531 U.S. at 332.

The dissent's reliance on three circuit court cases fares no better than its reliance on *Summers*. In the first such case, *United States v. Cephas*, 254 F.3d 488 (4th Cir. 2001), this Court held that exigent circumstances justified the police officers' warrantless entry into the defendant's residence. Significantly, the defendant in that case did not challenge the legality of his detention.[16] *Id.* at 494 (stating that the legal issue under consideration "is whether Sergeant Shapiro's warrantless entry into Cephas's apartment was lawful"). Thus, our decision in *Cephas* is inapposite here.

---

justify the prolonged detention of a suspect while a warrant is obtained, such an extension would not automatically answer the question posed in this case. In our view, it is doubtful whether the type of "exigent circumstances" referenced by the Court in *Summers* would encompass the detention, for a period of three hours, of persons who are not suspected of participating in criminal activity.

[16]Our decision in *Cephas* is also distinguishable on the basis that, once inside the apartment, the officers observed evidence of drug activity in plain view that was near the persons who were detained. *See* 254 F.3d at 491. Thus, in *Cephas*, in contrast to the present case, the police officers had individualized suspicion that the defendant was involved in criminal activity.

Similarly, in the out-of-circuit cases relied upon by the dissent, *United States v. Limares*, 269 F.3d 794 (7th Cir. 2001), and *United States v. Ruiz-Estrada*, 312 F.3d 398 (8th Cir. 2002), the defendants did not challenge the legality of their detention in the absence of a search warrant. Rather, the defendants in both of those cases challenged the warrantless entry that occurred. *See Limares*, 269 F.3d at 798 (Limares "contends that the agents violated the [F]ourth [A]mendment by entering 2705 S. Harrison [Street] in advance of [the] warrant" being issued); *Ruiz-Estrada*, 312 F.3d at 404 (Ruiz-Estrada "claims the officers illegally entered the apartment absent exigent circumstances and exploited their presence inside the apartment to obtain information to use in the affidavit filed in support of a search warrant").

We are aware of no authority, and the dissent has cited none, that supports the dissent's suggested expansion of police power at the expense of settled Fourth Amendment principles. Although there may well be legitimate law enforcement objectives that would be furthered by allowing police to detain individuals in the posture of Watson and Steele in the absence of a warrant, those objectives must yield to the protections guaranteed by the Fourth Amendment.

## C.

We next consider the issue whether Watson's incriminating statement should be suppressed as the product of his unlawful custodial arrest. The Supreme Court long has held that an incriminating statement obtained by exploitation of an illegal arrest may not be used against a criminal defendant. *Brown v. Illinois*, 422 U.S. 590, 603 (1975); *Wong Sun v. United States*, 371 U.S. 471, 484-86 (1963); *see also Kaupp v. Texas*, 538 U.S. 626, 632-33 (2003) (per curiam) (vacating conviction on basis of admission of confession obtained as result of unlawful arrest); *United States v. Seidman*, 156 F.3d 542, 548-49 (4th Cir. 1998) (discussing *Wong Sun* and *Brown* decisions). In evaluating the admissibility of a defendant's statement

made after an illegal arrest, the government bears the burden of establishing that the defendant's statement was "'sufficiently an act of free will to purge the primary taint.'" *Brown*, 422 U.S. at 602 (quoting *Wong Sun*, 371 U.S. at 486).

The determination whether there was a "break" in the causal chain between an unlawful arrest and a defendant's incriminating statement depends on the facts of each specific case. *Id.* In analyzing the admissibility of such a statement, we consider several factors, including: (1) the "purpose and flagrancy of the official misconduct"; (2) whether *Miranda* warnings were given to the defendant; (3) the "temporal proximity of the arrest and the confession"; and (4) the presence of intervening circumstances. *Brown*, 422 U.S. at 603-04; *see also United States v. McKinnon*, 92 F.3d 244, 247 (4th Cir. 1996) (discussing *Brown* factors).

In the present case, we first observe that although the very nature of the prolonged detention was inherently coercive, the record does not show that any flagrant police misconduct occurred. *Cf. Brown*, 422 U.S. at 605 (concluding that the "impropriety of the arrest was obvious" and "had a quality of purposefulness" that was "calculated to cause surprise, fright, and confusion"). We also observe that the officers provided *Miranda* warnings to Watson on two separate occasions, once when he was first detained and again when Detective Jamison returned to the building with the signed search warrant.

The issuance of *Miranda* warnings, however, does not automatically cure the taint of an illegal arrest. *Brown*, 422 U.S. at 602, 604; *see also United States v. Sanders*, 954 F.2d 227, 231 (4th Cir. 1992) (citing *Brown*). The record also must satisfy the government's burden of showing a break in the causal chain between the defendant's unlawful arrest and his incriminating statement. *Brown*, 422 U.S. at 603-04. Here, this "temporal proximity" factor weighs strongly in Watson's favor because he was not freed from the officers' custody at any point between his initial seizure and the time he made his

incriminating statement. Thus, in this respect, the causal connection between the illegality and the incriminating statement remained unbroken.

Additionally, the record fails to show that there were any "intervening circumstances" attenuating the illegal arrest from Watson's statement. *See id.* at 603-04. The officers restrained Watson continuously for three hours in the same location, where they later obtained his statement about the gun. In short, Watson's statement occurred as part of an uninterrupted course of events, during which "there was no intervening event of significance whatsoever."[17] *See id.* at 604. Accordingly, we hold that the district court erred in denying Watson's motion to suppress because there was no break in the causal connection between his unlawful custodial arrest and his statement, rendering the statement the product of his unlawful arrest rather than "an act of free will unaffected by the initial illegality." *See id.* at 603.

### D.

Having concluded that Watson's incriminating statement was improperly admitted into evidence, we now must address the impact of that error on Watson's trial. *See Arizona v. Fulminante*, 499 U.S. 279, 295 (1991) (concluding that harmless error analysis applies to coerced or involuntary statements); *United States v. Blauvelt*, 638 F.3d 281, 290 (4th Cir. 2011) (applying harmless error analysis to incriminating statement made by defendant following his detention, which was assumed to be unlawful). In assessing whether a constitutional error was harmless, we determine whether the admission of

---

[17]We reject the government's argument, offered without any supporting authority, that the officers' discovery of the firearm and ammunition was a qualifying "intervening event" under the holding in *Brown*. The record does not provide any indication that, absent the unlawful custodial arrest, Watson would have been present during the search when the officers discovered the toiletry bag and its contents.

the statement at issue "was harmless beyond a reasonable doubt, such that it is clear that a rational fact finder would have found [the defendant] guilty absent the error." *United States v. Poole*, 640 F.3d 114, 119-20 (4th Cir. 2011) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

Upon our review of the record, we are unable to conclude that the admission of Watson's statement was harmless beyond a reasonable doubt. The district court properly instructed the jury that to find Watson guilty of the offenses charged, the government was required to prove beyond a reasonable doubt that Watson "knowingly possessed" the firearm and ammunition that was found in the toiletry bag. The district court also instructed the jury regarding the government's burden to prove that Watson possessed these items "purposefully and voluntarily, and not by accident or mistake." Further, because the government sought to establish Watson's constructive, rather than actual, possession of the items, the court instructed the jury that to find Watson guilty of the charges, the jury had to find beyond a reasonable doubt that Watson "had the power and intention to exercise control over either the firearm or the ammunition."[18]

Watson's theory at trial, as emphasized during his closing argument, was that he did not own or otherwise knowingly possess the revolver or ammunition, but rather that the bag containing those items was "stashed" in Watson's closet by Jackson after he observed police activity near the building. The defense noted that Jackson and Watson both lived on the second floor of the building, and that Jackson had a lock on the door to his room but that Watson did not. The defense further noted that Jackson was a drug dealer known to carry firearms, and that the officers believed Jackson was carrying a firearm when he was observed earlier conducting a suspected

---

[18]Neither party contends that the district court's instructions to the jury were erroneous.

drug transaction near the building, but that he was unarmed when arrested after leaving the building.

In contrast, the evidence presented by the government to prove that Watson knowingly possessed the firearm and ammunition was: (1) that the contraband items were found in Watson's room, which also contained other items belonging to Watson; and (2) Watson's statement regarding the gun. There was no other evidence tending to establish that Watson owned or was aware of the firearm or ammunition found in the toiletry bag.

The fact that Watson owned the other items found in his bedroom did not mandate a conclusion that he also owned the toiletry bag containing the revolver and the ammunition. Without the evidence of Watson's statement, the jury may have chosen to accept the defense theory that Jackson, upon seeing a police presence, "stashed" the items in Watson's unlocked room.

The record also establishes that Watson's statement was a focal point of the jury's deliberations, which lasted more than nine hours. During this time, the jury submitted to the court two questions directly addressing Watson's statement. First, the jury requested that the court read "Detective Jamison's testimony when he showed the defendant the bag and asked about the gun." Second, the jury asked that the court "read from the transcript of the *direct examination* of Det. Jamison questions pertaining to the *gun* – did [Det.] Jamison say the words 'gun in your room' in the context of presenting the bag." (Emphasis in original). In response to this last request, the court read to the jury Detective Jamison's testimony detailing Watson's statement. Less than 30 minutes after being read that testimony, the jury reached its verdict finding Watson guilty.

We are unable to conclude "beyond a reasonable doubt" that "a rational fact finder would have found [Watson] guilty

absent the error." *See Poole*, 640 F.3d at 119-20. Three reasons support our conclusion: (1) the absence of direct evidence showing that Watson possessed the revolver and the ammunition; (2) the defense's theory, albeit speculative and circumstantial in its own right, that Jackson planted the firearm in Watson's room; and (3) the jury's questions relating to Watson's statement. Therefore, we hold that the district court's erroneous admission of Watson's statement cannot be deemed harmless.

## III.

In sum, we conclude that Watson was seized without probable cause, and that his three-hour detention constituted an unlawful custodial arrest in violation of his Fourth Amendment rights. We further hold that the district court erred in denying Watson's motion to suppress, because his incriminating statement was the product of his unlawful custodial arrest. Finally, we hold that the erroneous admission of Watson's statement was not harmless. Accordingly, we vacate Watson's convictions, and remand the case to the district court for further proceedings.

*VACATED AND REMANDED*

NIEMEYER, Circuit Judge, dissenting:

Baltimore City police officers concededly had probable cause to believe that heroin was being stored at and distributed from a building known as 2700 Tivoly Avenue in Baltimore. Relying on that probable cause and the exigent circumstances of possibly losing evidence, the officers entered the building; conducted a protective sweep of it; and detained two occupants until the officers were able to obtain a search warrant and search the building—a period of approximately three hours. As a result of the search, the officers found a revolver and ammunition in a room that one of the occupants, Prentiss Watson, acknowledged was his. Watson

was indicted for being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).

Contending that he was detained without probable cause, in violation of his Fourth Amendment rights, Watson filed a motion to suppress statements he made to officers in which he identified the room that was his and denied the operability of the firearm found there, arguing that the statements were the fruit of an illegal detention and should be suppressed. The district court denied the motion, and a jury convicted Watson for the illegal possession of the firearm and ammunition.

The majority today vacates Watson's convictions, concluding that without probable cause to seize Watson, his detention for the three-hour period during which police officers obtained a warrant and conducted the search was illegal. Ignoring the *suspicion* created by Watson's presence in a building as to which officers had probable cause to believe was the site of criminal activity, *see Michigan v. Summers*, 452 U.S. 692, 703-04 (1981), and the legitimate interests of law enforcement officers in detaining occupants of the building, *see id.* at 702-03, the majority concludes that without probable cause as to whether Watson himself committed a crime, the police officers were required to release him after conducting an initial protective sweep of the building.

This alarming ruling vitiates the long-standing police practice of detaining occupants found in a building, for which probable cause exists, while a search warrant is obtained and the building is searched, and raises new barriers to the use of such law enforcement procedures. *See, e.g.*, *United States v. Cephas*, 254 F.3d 488, 491, 495-96 (4th Cir. 2001) (noting that law enforcement officers, who had made a justified warrantless entry into an apartment, detained eight or nine occupants while a search warrant was obtained). Other circuits likewise have recognized that police practice. *See, e.g.*, *United States v. Ruiz-Estrada*, 312 F.3d 398, 404 (8th Cir. 2002) ("The act of securing the apartment [including its two

occupants] while awaiting a search warrant comports with the Fourth Amendment"); *United States v. Limares*, 269 F.3d 794, 799 (7th Cir. 2001) ("The agents respected the privacy of those found within [the building] by securing the premises but not conducting a search until the [search] warrant had been issued. This is a model of good, even over-cautious, police work").

With profound concern, I respectfully dissent.

I

Deputy Major Darryl DeSousa of the Baltimore City Police Department, along with other police officers, began conducting covert surveillance for drug trafficking in the 2700 block of Tivoly Avenue, Baltimore, at approximately 11:00 a.m. on February 23, 2010. DeSousa reported, "There was a lot going on in that block at the time." Detective Richard Jamison, who was initially receiving radio reports from DeSousa, stated, "I got the impression that things happened quicker than anyone anticipated them happening, because we were trying to get [arrest teams] from everywhere we could due to the sheer volume of, I guess, purchasers, customers." DeSousa's observations included watching Leroy Smith escort several individuals to a position in an alley across the street from 2700 Tivoly Avenue, where Smith had them wait while he crossed the street and met with Anthony Jackson in the alley next to 2700 Tivoly Avenue. The building known as 2700 Tivoly Avenue was an end unit row house that had a front entrance on Tivoly Avenue and a side entrance on the alley. A convenience store was operated from the front of the first floor, and a storeroom was located at the rear. Three bedrooms and a bathroom were located on the second floor. After Smith and Jackson spoke briefly, DeSousa observed Jackson enter 2700 Tivoly Avenue through the side door and emerge from the building a short time later, holding a plastic bag that he handed to Smith. Smith then went back across the street to hand small items from the plastic bag to the waiting individu-

als in exchange for cash. During the course of his observations, DeSousa observed Jackson go in and out of 2700 Tivoly Avenue "on a regular basis."

Based on these observations, DeSousa directed several arrest teams to the area, and those teams, acting on DeSousa's information, then began arresting purchasers who had left the site. At that time, they arrested Smith, Stanley Brody, and Bryan Crawford and, in connection with these arrests, recovered gel caps containing heroin.

As police officers arrived at 2700 Tivoly Avenue, DeSousa saw Jackson grab his waistband in a way that suggested he was armed. Jackson then ran into the side entrance of the building. A short time later, Jackson exited the building through the convenience store's front door, and police arrested him as he was getting into his car. Upon frisking him, they did not find a weapon.

Based on what had been observed and on the earlier arrests, the police concluded they had probable cause to believe that drugs were being distributed from the building. They decided to obtain a search warrant and, in the interim, to enter and secure the building to prevent the destruction of evidence. While Detective Jamison was obtaining the search warrant, a team of officers entered the building's side entrance and followed standard police procedures to secure the building. Under those procedures, the officers were to "check every location a human being could be to make sure that we're all safe, and we don't have armed suspects in the house," and they were to bring any individuals who they found on the premises to "a central location where they could be watched for everyone's safety" until the warrant had been obtained and the investigation completed. Accordingly, as the officers entered the building, some went to the second floor to conduct the protective sweep and others to the convenience store on the first floor. There, Officer Reginald Parker and Officer Corey Jennings encountered Keta Steele, the building's

owner, and Prentiss Watson, who were working behind the counter. Officer Parker told Watson to sit down, and he advised both Steele and Watson of their *Miranda* rights, which they both said they understood. He also advised them that the police were seeking a warrant to search the building and that "we're going to detain you until the warrant is actually prepared."

In the meantime, Detective Jamison prepared the affidavit and the warrant application and took it to a judge in downtown Baltimore, where the judge signed the warrant at 3:34 p.m. Jamison then returned to 2700 Tivoly Avenue with the warrant, arriving there at 3:45 p.m. At that point, Officer Parker again read Steele and Watson their *Miranda* rights, and Detective Jamison went upstairs to assist in the search. In the back bedroom, officers recovered a shotgun and heroin, as well as a piece of mail with Watson's name on it. In the front bedroom, the officers recovered marijuana, a revolver, several kinds of ammunition, and mail with Watson's name on it. When Detective Jamison confronted Watson about the fact that his mail had been found in the back room where there was also a shotgun, Watson stated that he "just store[d] some stuff back there" and that he did not "know anything about a shotgun." Jamison also asked Watson where Jackson stayed, and Watson replied, "in the middle room." And when Jamison asked Watson where he stayed, Watson stated, "the front room." When Jamison later showed Watson the revolver and the ammunition taken from the room Watson had identified as his, Watson stated, referring to the revolver, "that old thing [doesn't] even work."

Watson was indicted in two counts, one for being a felon in possession of a firearm and one for being a felon in possession of ammunition, both in violation of 18 U.S.C. § 922(g)(1).

Watson filed a motion to suppress the statements that he made to the police while being detained. He argued that the

police violated his Fourth Amendment rights when they detained him without probable cause during the period when they were obtaining the search warrant and searching the building and that his statements made during the course of the search were the product of his illegal detention. The district court denied Watson's motion, concluding that "the temporary seizure . . . was clearly supported by probable cause as to this building, and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time." The court concluded that the detention lasted approximately three hours, finding that "[t]he warrant was approved as quickly as possible in light of the caseload that the state judges in Baltimore need to deal with" and referring to the "crisis in the criminal justice system in the courts of Baltimore City." As an additional and alternative finding, the court concluded that Watson's statements were in any event made voluntarily and not as a result of the allegedly illegal detention.

After a four-day trial, the jury convicted Watson on both counts, and the district court sentenced him to 31 months' imprisonment on each count, to run concurrently.

On appeal, Watson challenges only the district court's denial of his motion to suppress.

II

Watson contends that his three-hour detention was a seizure implicating the Fourth Amendment and that it was illegal because when officers detained him, they did not have probable cause to believe that he had committed a crime. He argues that therefore the statements he made during his detention were "the fruit of an illegal arrest" and should be suppressed.

The majority accepts Watson's argument, focusing on the absence of probable cause as to Watson. The majority opinion states, "During the entire course of that three-hour detention,

the police had no reason to believe that the detained individual was linked to any criminal activity, including the evidence sought in the search warrant application." *Ante*, at 8. The majority then proceeds to adopt a new rule, holding that without probable cause, Watson could only be detained during the period of the initial protective sweep of the building and thereafter had to be released. As the majority explains, "At some point during Watson's detention, *likely close to its inception*, any potential threat that Watson posed to the officers' safety had dissipated. Thus, at that point, any reasonable justification for continuing to detain Watson dissipated as well." *Ante*, at 14 (emphasis added).

Unfortunately, this view—that without probable cause, Watson's detention was not justified after the protective sweep was successfully accomplished—overlooks the reasonable *suspicion* that existed as to Watson. A reasonable suspicion undoubtedly arises with respect to persons found in a building that is openly being used for drug distribution or as a drug stash house, and police officers cannot allay that suspicion by merely conducting a protective sweep. Thus, under the facts before us, the officers could have reasonably suspected at the time the detention commenced that Steele and Watson were using their position from behind the retail counter to assist in the distribution of the heroin that officers had taken from the previously arrested customers. Under the jurisprudence of *Terry v. Ohio*, 392 U.S. 1 (1968), the officers having this suspicion had a right to detain Steele and Watson, for a reasonable period, pending issuance of a search warrant and a search to confirm or allay their suspicion.

The majority's position also overlooks numerous and substantial law enforcement interests that the police officers had in detaining Steele and Watson even after conducting a protective sweep. *First*, released occupants could destroy evidence at other locations linked, through a possible drug trafficking conspiracy, to evidence present in the secured building. *Second*, released occupants could arm themselves

and, with others, return to the building, a risk not minor in a context where drugs and guns are possibly involved. *Third*, releasing occupants would frustrate the officers' ability to arrest any occupant who might be inculpated as the result of the search. And *fourth*, by releasing occupants before the search of the building, the officers would be denied the potentially useful cooperation of the detainees when conducting the search. The Supreme Court has identified all of these interests as legitimate and important to law enforcement officers when securing a building as to which probable cause exists. *See Summers*, 452 U.S. at 702-03.

All agree in this case that Baltimore City police officers had probable cause to believe that 2700 Tivoly Avenue was being used for the distribution of illegal drugs, as numerous persons were arrested after obtaining heroin from that location. The officers actually saw Jackson go in and out of the building, bringing drugs out for distribution to Smith and, ultimately, to customers, who were arrested with the heroin. All also agree that exigent circumstances justified the officers' entry into the building to secure the evidence pending the issuance of a search warrant. *See, e.g.*, *Cephas*, 254 F.3d at 495 (noting that the factors justifying a warrantless entry based on exigent circumstances include "information indicating the possessors of the contraband are aware that the police are on their trail," "the ready destructibility of the contraband," and "the possibility of danger to police guarding the site" (internal quotation marks and citation omitted)). Finally, all agree that after making a lawful warrantless entry, the police were justified in conducting a "protective sweep" of the premises. *See ante*, at 13; *cf. Maryland v. Buie*, 494 U.S. 325, 337 (1990) (noting that officers may conduct a "limited protective sweep" in furtherance of officer safety).

The question presented in this case is whether Watson's presence in a building, where drug distribution was open and ongoing, objectively raised a suspicion as to him that was sufficient to detain him while obtaining a warrant and searching

the building. I suggest that the law on this issue is clear, as are the routine police practices that implement such law: When probable cause exists that a building contains contraband and that ongoing criminal activity is taking place there and when exigent circumstances justify a warrantless entry, the officers have a right to secure the building and detain its occupants for the period reasonably necessary to obtain a warrant and search the building. *See Summers*, 452 U.S. at 704-05; *Cephas*, 254 F.3d at 491, 494-96; *Ruiz-Estrada*, 312 F.3d at 400-01, 404; *Limares*, 269 F.3d at 796-97, 799. The reasons were set forth in *Summers*.

In *Summers*, as police arrived at a house to execute a warrant to search for narcotics, they encountered Summers descending the front steps. The officers detained Summers, as well as seven other occupants of the house, without having individualized probable cause, while they searched the premises. *Summers*, 452 U.S. at 693 & n.1. The Supreme Court held that Summers' seizure during the duration of the search was consistent with the Fourth Amendment, even though the Court assumed that his detention was unsupported by probable cause. *Id.* at 696, 705.

The Court began its analysis by describing two categories of seizures approved by its precedents. First, it noted that there was "the general rule that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause." *Id.* at 700. At the same time, the Court also acknowledged the line of cases beginning with *Terry*, in which it had "recognize[d] that some seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made *on less than probable cause*, so long as police have an articulable basis for suspecting criminal activity." *Summers*, 452 U.S. at 699 (emphasis added). With respect to this second category of seizures, the Court stressed that "the exception for limited intrusions that

may be justified by special law enforcement interests is not confined to the momentary, on-the-street detention accompanied by a frisk for weapons involved in *Terry* and *Adams* [*v. Williams*, 407 U.S. 143 (1972)]," explaining that "[i]f the purpose underlying a *Terry* stop—investigating possible criminal activity—is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry* and *Adams*." *Summers*, 452 U.S. at 700 & n.12; *see also id.* at 700 n.12 (noting that police may utilize "'several investigative techniques . . . in the course of a *Terry*-type stop,'" including detaining a suspect "'while it is determined if in fact an offense has occurred in the area, a process which might involve checking certain premises'" (quoting 3 W. LaFave, *Search and Seizure* § 9.2, pp. 36-37 (1978))).

To determine whether Summers' seizure was "controlled by the general rule" requiring probable cause or whether it could be justified as a *Terry*-type stop that satisfied the Fourth Amendment's reasonableness standard absent probable cause, the Court examined "both the character of the official intrusion and its justification." *Summers*, 452 U.S. at 701. Assessing the nature of Summers' seizure, the Court concluded that his detention "was substantially less intrusive than [a formal] arrest." *Id.* at 702 (internal quotation marks and citation omitted). In this regard, the Court noted that the "police had obtained a warrant to search [Summers'] house for contraband," observing that the detention, "although admittedly a significant restraint," was an "incremental intrusion on personal liberty" that was "surely less intrusive than the search itself." *Id.* at 701, 703. The Court also emphasized that the detention was unlikely to be "unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention" and that Summers' detention in his own residence during the course of the search "could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the

indignity associated with a compelled visit to the police station." *Id.* at 701-02.

Against the incremental intrusion associated with the detention, the Court posited three legitimate law enforcement interests advanced by detaining those present while a lawful search is conducted. *First*, there is an "obvious . . . legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found." *Summers*, 452 U.S. at 702. *Second*, "the orderly completion of the search may be facilitated if the occupants of the premises are present" because "self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand." *Id.* at 703. And *third*, the detention of occupants serves to "minimize[e] the risk of harm to the officers." *Id.* at 702. In this regard, the Court recognized that even though "no special danger to the police [was] suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence," emphasizing that "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Id.* at 702-03.

Finally, the Court also considered "the nature of the articulable and individualized suspicion" to justify the seizure, concluding that "[t]he existence of a search warrant . . . provides an objective justification for the detention" because "[t]he connection of an occupant" to a building that a judicial officer has approved searching for contraband "gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." *Summers*, 452 U.S. at 703-04.* Although recog-

---

*The majority apparently rejects this proposition in *Summers*, denying that a person's presence in a building as to which probable cause of criminal activity exists "gives the police officer an easily identifiable and certain basis" for suspicion. *See ante*, at 15.

nizing that a "prolonged detention[ ] might lead to a different conclusion in an unusual case," the Court nonetheless held that "*a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted*." *Id.* at 705 & n.21 (emphasis added). Moreover, the Court did not limit this principle to a circumstance where the warrant had actually issued, but recognized that probable cause and exigent circumstances could likewise justify the detention of occupants. *See id.* at 700 n.17 (noting that "the fact that our holding today deals with a case in which police had a warrant does not, of course, preclude the possibility that *comparable police conduct may be justified by exigent circumstances in the absence of a warrant*") (emphasis added).

The Court also clarified that the justification for detaining occupants of premises as to which probable cause exists was categorical, noting that "if police are to have workable rules, the balancing of the competing interests inherent in the *Terry* principle must in large part be done on a categorical basis— not in an ad hoc, case-by-case fashion by individual police officers" and observing that "[t]he rule we adopt today does not depend upon such an ad hoc determination, because the officer is not required to evaluate either the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." *Id.* at 705 n.19 (internal quotation marks and citations omitted); *see also Muehler v. Mena*, 544 U.S. 93, 98 (2005) (applying *Summers* to hold that an individual's detention for up to three hours while police conducted a search was reasonable because she was an occupant of an address for which a search warrant had been issued at the time of the search); *United States v. Photogrammetric Data Servs., Inc.*, 259 F.3d 229, 239 (4th Cir. 2001) (relying on *Summers* to hold that because police were in possession of a valid warrant to search the premises of a business, officers "necessarily had authority to secure the premises and detain the employees temporarily in order to conduct the search with minimal inter-

ference"), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004).

*Summers* clearly guides our analysis here and directly supports the reasonableness of the police officers' actions in this case. To be sure, the police in *Summers* had already obtained a search warrant when they appeared at Summers' house. But the Court also noted that "comparable police conduct may be justified by exigent circumstances in the absence of a warrant." *Summers*, 452 U.S. at 702 n.17. More importantly, the principles enunciated in *Summers*, *while depending on probable cause as to criminal activity in the house*, did not, in the end, hinge on the issuance of the warrant itself. Rather, the culpability of the premises, the nature of the intrusion, and the law enforcement interests implicated by the situation justified the detention.

Thus, under *Summers*' reasoning, the temporary detention of those occupying premises that police have lawfully secured while awaiting a search warrant, although amounting to a seizure within the Fourth Amendment, is substantially less intrusive than a traditional, formal arrest that may only be justified by probable cause. *See Summers*, 452 U.S. at 701-02. Given that the police had probable cause to believe that criminal activity was ongoing at 2700 Tivoly Avenue and that entry without a warrant was justified by exigent circumstances, detaining Watson and Steele at the scene in the interim was not an overbearing intrusion on their personal liberty. Indeed, many law-abiding citizens in Watson and Steele's position would likely want to stay on the premises for a reasonable period of time to observe the officers stationed in their home and place of business. *See id.* at 701. As such, the seizure at issue here was perhaps no more intrusive than the majority's suggested alternative of removing Watson and Steele from the building and prohibiting their reentry. *See ante*, at 11.

Moreover, the additional intrusion caused by a temporary detention in these circumstances is justified by the same legit-

imate law enforcement interests implicated in *Summers*. Just like in *Summers*, the police here had a legitimate "interest in preventing flight [of the building's occupants] in the event that incriminating evidence [was] found" and in ensuring that those present remain to facilitate "the orderly completion of the search" once it was authorized. *Id.* at 702-03. And just like in *Summers*, the police had a substantial interest in minimizing the harm to officers that was inherent in securing a building prior to a search for drugs and guns. *See id.* To allow those present when police secure a building to subsequently depart while the officers wait for the warrant would substantially increase the risk of harm to the police left guarding the site. Indeed, from an officer-safety perspective, police would find themselves in a much worse position than they faced before they had effected a lawful warrantless entry to secure the building, becoming vulnerable to attack by those armed with knowledge regarding the number of officers on the scene and fortified by their desperation to keep the police from uncovering the contraband that officers have probable cause to believe is present.

And finally, the temporary detention of Watson and Steele was justified by the same type of "articulable and individualized suspicion" that supported the detention in *Summers*. *Id.* at 703. The "connection of an occupant" to a building that the police have lawfully secured pending the issuance of a search warrant "gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." *Summers*, 452 U.S. at 703-04. The majority misses this point, repeatedly asserting—presumably based on the officers' testimony that they did not have any specific information relating to Watson when they entered the building—that the police did not suspect Watson of any criminal activity. But under the logic of *Summers*, the fact that Watson was an occupant of a building that police had probable cause to believe harbored heroin and served as a facility from which heroin was being openly distributed pro-

vided the police *with reason to suspect* Watson of participating in the ongoing criminal activity.

In sum, balancing the nature of the intrusion in this case against both the legitimate law enforcement interests and the articulable suspicion supporting the detention, the Baltimore City police acted reasonably when they temporarily detained the individuals occupying a place that officers had lawfully entered and secured.

Of course, this type of detention should not last "longer than reasonably necessary for the police, acting with diligence, to obtain the warrant." *Illinois v. McArthur*, 531 U.S. 326, 332 (2001). But in the circumstances of this case, involving the preparation and obtaining of a warrant from a judge otherwise carrying a heavy criminal docket in a busy city courthouse, a three-hour detention was not unreasonable. *See Mena*, 544 U.S. at 98 (approving a detention of three hours while police conducted a search).

Contrary to these governing principles, the majority establishes a new rule that police officers, finding occupants in a building as to which probable cause exists that contraband is being harbored and crime is being committed therein, must nonetheless release the occupants after completing the protective sweep. *See ante* at 14. In doing so, the majority completely overlooks: (1) the suspicion created by the very presence of the detained occupants in a building from which drugs were being distributed, (2) the risks the rule would cause to law enforcement officers, and (3) the legitimate benefits it would deny them. Because I conclude that Watson's detention was reasonable, I would affirm.